CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JAN 05 2018

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

MARY DAVID,                          )
                                     )
    Plaintiff,                   )        Case No. 5:16-CV-00063
                                     )
v.                                   )
                                     )
WINCHESTER MEDICAL                   )        By:    Michael F. Urbanski
    CENTER,                      )        Chief United States District Judge
                                     )
    Defendant.                   )

## MEMORANDUM OPINION

This matter comes before the court on defendant's Motion for Summary Judgment, ECF No. 37, in which defendant Winchester Medical Center ("WMC") seeks summary judgment on Counts I and II of plaintiff Mary David's Complaint (the "Complaint" or "Compl."), ECF No. 1.[1] David has also filed a Motion to Strike, ECF No. 40, which WMC opposes. For the reasons discussed below, the court will **GRANT** WMC's Motion for Summary Judgment and **DENY** David's Motion to Strike.

### I.    Summary Judgment Standards

Pursuant to Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to

---

[1] The court previously dismissed Count III, an ADA claim, Count IV, an age discrimination claim, and Count II, the retaliation claim, to the extent it alleged retaliation for attempting to negotiate release of potential employment claims. ECF No. 22.

interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255. The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). Instead, the non-moving party must show that "there is sufficient evidence

favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (quoting Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 124 (4th Cir. 1990)).

## II.     Background

David's Title VII claims arise out of events that occurred during her employment at WMC. In short, David claims that the actions of Dr. Nicolas C. Restrepo constituted sex-based discrimination, and she was terminated in retaliation for threatening to file a sexual harassment complaint against Dr. Restrepo.

### A.     Organizational Structure of WMC

David was employed at WMC as the Director of Critical Care and Nursing, Heart, and Vascular Center. Deposition of Mary E. David ("David Tr.") 27:23–30:1 & Ex. 4. David did not supervise other directors or physicians. Id. 34:6–7; 35:6–11. Critical Care is one of seven departments under the supervision of the Vice President of Nursing ("VPN") at WMC, each of which was headed by a director. Id. 32:2–34:8, 35:17–36:1 & Exs. 4, 6. During David's employment, Kathy Tagnesi originally served as VPN, and Anne Whiteside replaced Tagnesi in March 2013; David reported directly to them. Id. 33:3–11. Both Tagnesi and Whiteside, and all seven directors under the VPN's supervision, were at all relevant times female. Id. Ex. 4.

3

## B. Dr. Restrepo

Dr. Restrepo is the Vice President of Medical Affairs at WMC. Affidavit of Nicolas C. Restrepo, MD ("Restrepo Aff.") ¶ 1. He began this position in 2011. Deposition of Nicolas C. Restrepo, M.D. ("Restrepo Tr.") 7:2–9. Both Dr. Restrepo and the VPN report directly to the President of WMC. David Tr. Ex. 6. Accordingly, "Anne Whiteside is Restrepo's peer." Mem. Opp. Def.'s Mot. Summ. J. ("Opposition to the Motion for Summary Judgment" or "MSJ Opp."), ECF No. 39, at 5.

Dr. Restrepo states he can come across as "brash." Restrepo Tr. 45:6–7. Whiteside stated that Dr. Restrepo's behavior was "surgeon-like" and that people found him to be "intimidating." Deposition of Winchester Medical Center By and Through Its Designated Representative Anne Whiteside ("Whiteside Tr.") 58:20–53:6. WMC has tried to improve Dr. Restrepo's communication style. Id. 55:20–56:18. While WMC claims that Dr. Restrepo's communication style has improved, Declaration of Lori Brown ¶ 5, Affidavit of Carla Dallmann ("Dallmann Aff.") ¶ 21, Declaration of Katrina Minter ¶ 5, Declaration of Desiree Brunelle ("Brunelle Decl.") ¶ 5, Dr. Restrepo still received some complaints about his communication style as late as January 2017, Restrepo Tr. Ex. 3 at 30–33. Nonetheless, in the same January 2017 review, Dr. Restrepo still received an overall rating of 3.49 for "Interpersonal savvy," and 3.93 for "Communicating effectively," both of which lie between "Effective" and "Highly Effective." Restrepo Tr. Ex. 3 at 4.

## C. Policies Governing Employment of WMC

Certain policies and professionalism standards governed David's employment at WMC. David's job description, effective as of August 2008, required David "to collaborate

with nursing staff at all levels, interdisciplinary teams and executive team leaders," take "responsibility for actions of self and staff in own department," and "[d]emonstrate STARS behaviors in all interactions." Def.'s Br. Supp. Mot. Summ. J. ("Motion for Summary Judgment" or "MSJ Br."), ECF No. 38, Ex. 3, at 119. Further, David's position "require[d] a person with a positive attitude, who is pleasant and cooperative, displaying a professional demeanor with patients, families' physicians and fellow employees." Id.

The "STARS" behaviors, which were also called "Corporate values," required David to "treat [other employees] with courtesy and respect at all times," "anticipate and offer support, guidance and encouragement to each other," "remain open to new viewpoints, ideas, and talents," and "participate in, accept, and carry out team decisions." Id. at 120. As late as April 9, 2012, David signed that she had "read and underst[ood] the Standards of Behavior for Valley Health [i.e., STARS] and pledge[d] to comply with and practice these behaviors." Id. at 121.

At her deposition, David admitted that STARS behavior governed her employment. David Tr. 30:4. She understood that developing a trusting and respectful relationship with each other was "part of the basis" for STARS. Id. 31:5–7. She believed that "the STARS value [sic] were an integral part of creating a cohesive unit, so if people didn't respect the STARS values, it was hard to—it was hard to move people along." Id. 59:16–19.

The STARS values were transitioned "to a new values program . . . effective January 1, 2013." Mem. Supp. Mot. Strike. ("Mot. Strike"), ECF No. 41, Ex. 2; Whiteside Tr. 77:14–16. David does not dispute that a similar values system continued after STARS was phased

out. Whiteside testified that STARS was simply "the words that go along with our values, . . . the service standards." Whiteside Tr. 77:17–20.

David was also subject to WMC's Corrective Action/Work Rules-Policy and Workplace Anti-Violence Policy. Affidavit of Kathy Kagarise ("Kagarise Aff.") ¶¶ 15–16 & Ex. 14. The latter policy "prohibit[ed] verbal abuse," which was defined as "any verbal expression issued with the intent of creating fear or intimidation in another individual," and also prohibited the "creation of a hostile work environment through verbal and nonverbal behavior." Id. ¶ 16. The Corrective Action/Work Rules Policy stated that all WMC employees were at-will employees. Id. It listed as a suggested first step for disruptive, abusive, or harassing behavior "the suspension or termination of the offending employee." Id.

### D.    David's Employment Evaluations from 2007–2013

David's early performance reviews were, overall, very good. See MSJ Opp. 3 (ranging from "generally exceeds standards" to "outstanding"). Her 2007 performance review noted that her "ability to work with a variety of people" was "Outstanding," and her ability to "build positive working relationships . . . [g]enerally exceeds standards." David Tr. Ex. 7. For her performance appraisal process in 2007–08, David was required to develop an action plan to improve employee satisfaction scores for her direct reports. Id. She also received a score of 1/5 on her 2008 performance evaluation for customer service. Id. Ex. 9.

In 2008 through 2010, David's direct reports and fellow directors made complaints about David's communication style. Id. 36:14–37:24, 38:10–40:1, 30:13–41:13, 42:1–7, 42:21–43:20, 44:15–46:14. These complaints included that David was argumentative and

6

uncooperative, refused to attend meetings with staff, and unreasonably blocked an applicant for a job interview. Id. David testified that she believed the complaints about her communication style came down to: "So I tend to be quiet and very serious, so sometimes I come across as direct. Or when things need to get done, I came across as telling people what to do rather than asking them to participate. . . . I came across as not being warm and fuzzy . . . ." Id. 37:11–17.

David's 2013 review had an overall score of 3.42/5.00, which indicates "fully meets expectations." Id. Ex. 12. Her score for "managing conflict" was "2/5," or "not full meeting standards." Id. David's employee engagement scores also fell below organizational averages, and Whiteside listed "turnover" as another area for improvement. Id. Ex. 13.

### E. The 2011 and 2012 PIPs

In 2010, Tagnesi, the then-VPN of WMC, "had received many complaints about [David's] behavior toward other leaders and employees, which increased in 2010." Kagarise Aff. ¶ 4. These complaints included "not working effectively or collaboratively," "gossiping and speaking in a derogatory manner about her colleagues," "sabotaging certain initiatives," and "spreading information in a 'toxic' manner." Id. WMC strongly considered terminating David's employment at that time. Id. ¶¶ 6–7 & Exs. 1, 7.

Tagnesi ultimately decided to give David another chance, placed her on a Performance Improvement Plan ("PIP") for 90 days, and hired an outside coach to assist David in changing her behavior. Id. ¶¶ 7–8. When the coach solicited feedback from David's colleagues, there was both positive and negative feedback. Id. ¶ 8 & Ex. 9; David. Tr. Ex. 9. David completed the PIP on or about July 26, 2011, and Tagnesi noted that only David's

7

successful completion of the PIP would allow her to "continue in her Director Role." Kagarise Aff. ¶ 9 & Ex. 10. Tagnesi informed David that "she must, going forward, sustain behavioral results and STARS outcomes. This includes working with internal and external customers." Id. Ex. 10. David knew that she was required to sustain and maintain this performance or face possible termination. David Tr. 73:10–75:3, 143:3–18. David received another PIP in 2012 for certain auditing failures. Id. 75:11–76:10 & Ex. 3.

## F.    David's Complaints Against Others

Before David received her first PIP, she filed a complaint entitled "Concerns for Human Resources" against Tagnesi. Id. Ex. 22 at 1. The second paragraph of the complaint began "Creating a hostile work environment" and then defined that term.[2] Id. David expressed displeasure that Tagnesi had accused her "of various infractions of policy and lack of teamwork and communication," and that "[e]ach time the accusations have been proven false." Id. David was upset that Tagnesi "undermine[d] [her] leadership by having people investigate [her] with [her] staff" and had spoken with David's staff without informing her first. Id.

---

[2] David now contends that her complaint against Tagnesi did "not, in any way, allege that Kathy Tagnesi had created a hostile work environment against David." Mot. Strike 11. David bases this argument solely on David's deposition testimony: "I don't think Kathy was creating a hostile work environment . . . . It wasn't Kathy creating the environment." Id. at 12 (citing David Tr. 145:21–146:11). David's argument is belied by the text of her complaint. The second paragraph of the complaint defined "hostile work environment." David Tr. Ex. 22 at 1. David's complaint focused almost entirely on how Tagnesi allegedly wronged David. See, e.g., id. at 1 ("I have been called into Kathy Tagnesi office [sic] on three separate occasions and accused of various infractions of policy and lack of teamwork and communication," but "[e]ach time the accusations have been proven false."); id. ("Kathy presented a list of accusations that she had been investigating without ever discussing with me. . . . My staff . . . have asked me what is going on and what is Kathy looking for."); id. at 3 ("Kathy then says she is obligated to review these concerns, but never does so with me and the individual that has the concerns, or makes the individual talk directly to me about their concerns. It is always Kathy explaining what was said, and their intent[.]"); id. ("I can and did write a plan, but if it is Kathy's intent to fire me, or destroy my reputation, I am being backed in a corner where the only option left is to resign."). David's post hoc explanation of the complaint, provided seven years after she filed it, is insufficient to create a genuine issue of material fact regarding the fact that the complaint, on its face, did raise hostile work environment complaints.

8

Carla Dallmann was a member of the planning team responsible for instituting certain safety measures. Dallmann Aff. ¶ 2. These included a daily "safety call," which encouraged reporting of potential risks and other areas of concerns. Id. ¶¶ 2–5. Other WMC directors expressed concerns that David was instructing or coercing her employees not to participate. Id. ¶¶ 6, 8; Whiteside Aff. ¶ 7; Brunelle Decl. ¶ 4.

Around October 2012, there was a "sentinel event"—a patient safety event that resulted in death, permanent harm, or severe temporary harm—in David's department. Dallmann Aff. ¶ 12. Jennifer Haines of the Performance Improvement department investigated the event. Id. David was upset about the investigation and told Dallmann she did not want Haines in her department. Id. In particular, David complained that she believed Haines had told Dr. Restrepo that David was instructing her staff not to report issues on safety call. David Tr. 168:11–169:2 & Ex. 30. David was upset that Haines gathered this information without telling her. Dallmann Aff. ¶ 12. Dallmann considered David's concern unreasonable. Id.

Later, in an October 12, 2012 email, David complained to Dallmann about Dr. Restrepo calling him "a bully, who hounds you until you just give him your lunch money as the consequences are not worth it." David Tr. Ex. 30.While David complained that Dr. Restrepo was a "bully," her email did not raise discrimination of any kind.[3] Id.

David again filed a formal complaint, this time against Haines (but not Dr. Restrepo). Id. Ex. 31. David complained that Haines was "Creating a Hostile Work Environment, undermining credibility and trust." Id. David's concerns were unfounded, Dallmann Aff.

---

[3] In her deposition, David raised the specter of discrimination, but this again is a post hoc interpretation of the email, which is insufficient to raise a genuine issue of material fact. The plain text of the email did not raise or suggest discrimination based on sex (or any other factor).

¶¶ 12–13, and David's complaint was resolved by having Haines meet with her to explain the process behind her investigatory role, David Tr. 179:3–180:22.

### G. Dr. Restrepo's Recent Behavior Toward David

David made several complaints about Dr. Restrepo's behavior, and claimed that his behavior was because David was female.[4] In particular, during a safety-call meeting on August 21, 2014, Dallmann rounded with David, Jeff Behneke (director of heart and vascular operations), and Tammy Courtney (director of respiratory therapy), so some of David's staff could remain in a conference room with Dr. Restrepo and Whiteside, discuss the purpose of the safety call, and address any concerns about reporting information. Dallmann Aff. ¶ 19; David Tr. 101:8–9 & Exs. 4, 6. The meeting was held in the critical care conference room, which bothered David. David Tr. 99:5. When David and the other rounders returned to the meeting room, Dr. Restrepo asked them to wait outside. Id.

David, Dallmann, Behneke, and Courtney attempted to reenter the room. Dr. Restrepo singled out David and said "You need to go out. Mary David, you need to get out of here," or, "I'm not done, Mary David, you need to get out now." Id. 100:16–101:13, 102:4–16. David felt embarrassed and singled out, but no other director was allowed in either. Id. 102:17–104:3. Notably, Dallmann and Courtney, who are both females, were also not allowed to enter, nor did Dr. Restrepo call out either by name. Id. 103:1–4.

David also felt mistreated during safety calls generally:

So every day, Dr. Restrepo treated me like I was his personal secretary. No matter what time I come in the room, it's like, You come here. Sit here. He

---

[4] David moves to strike the affidavits of Dallmann, Whiteside, and Kagarise because David alleges that parts of these affidavits are inconsistent with the affiants' previous deposition testimony. In particular, David takes issues with the affidavits' claims that David did not raise discrimination with the three affiants. The court discusses the Motion to Strike at length below. For now, the court has drawn all factual inferences in favor of David.

10

directed where I would sit and I was expected to sit there and take notes. If I sat at the end of the table so I didn't have to sit next to him, he made me get up from the end of the table and come either sit next to him or sit across from him, and it was always, You come.

If I came in the room late, it's like, Where is Mary David? How come she's not here? Where is she? Come up here and sit down. And I had to sit there in front of—or across from him for all of the safety calls that we did. If for some reason I didn't go down to the safety calls and I listened upstairs with everybody else and called in, he'd be like, Where is Mary David? How come she's not at the safety calls? Even when we started holding them over in the auditorium instead of in the conference room, he would look around the table and say, I don't see Mary David. Where is Mary David?

Id. 118:16–119:11. Nonetheless, despite other women being present during safety call, David admitted that "he never did that to anyone else." Id. 119:12.

David also testified that Dr. Restrepo never addressed anyone else in the manner in which he addressed David:

He doesn't speak—he speaks only to—to me—to me as a female. All the men are, you know, my boy, my man, Joe. It's degrading to me in particular as a female. He speaks differently to men. And he specifically directs this during this period of time at me.

Id. 113:3–8. While David claimed that Dr. Restrepo that spoke differently to men than women, David's testimony only reveals the following difference in Dr. Restrepo's communication with men and women: "I think he spoke in derogatory terms to other women, didn't address them as—as my friend or my colleague. We were all like, You do this or you go do that. I think he was very disrespectful." Id. 113:25–114:3.

## H.    David Reports Dr. Restrepo's Actions to Others

During the spring and summer of 2014, David had conversations with Dallmann and complained about the way Dr. Restrepo "spoke to me and how he was demeaning, how he called me out and what was her suggestions [sic] to do about his behavior." Id. 201:5–9. In

11

those conversations with Dallmann, David said that Dr. Restrepo "made me feel like he was discriminating against me as a woman, that he was pointedly—didn't refer to me in—in a— address me as a person." Id. 204:4–7.

> He totally treated me differently than he treated the male people who he—the male counterparts who he'd become complimentary of and send them to do things, and that his treating of me was affecting—starting to affect my performance, to come here every day and just be constantly criticized.

Id. 204:9–15.

David had a conversation with Whiteside and asked: "[C]ould you please have him stop pointing me out, stop calling me out on things and making an example of me and humiliating me in front of all of the counterparts." Id. 201:25–202:4. On August 21, 2014, two days before David was suspended, she told Whiteside "that this is about as much as I could take and it was time to go higher if we weren't going to do things." Id. 203:1–3. David also told Whiteside that Dr. Restrepo's "behavior towards me was demeaning and humiliating, that he was discriminating against me based on my being female and being lesser than him." Id. 206:3–5.

## I.    WMC's Investigation into Allegations of David's Abuse of Staff

In February 2014, David was the subject of a "risk report" by WMC security officers. Dallmann Aff. ¶ 17 & Ex. 2. The officer reported that he had informed David that she could not involuntarily detain a patient without a temporary detention order ("TDO") from a judicial authority. Id. David did not have a TDO, David Tr. 185:24–186:16, 188:13–189:1, so the officer was correct (and David incorrect) that David could not keep him detained. The report claimed that David pointed her finger into one officer's face while speaking loudly and disrespectfully. Dallmann Aff. ¶ 17 & Ex. 2.

In June 2017, David had disciplined Dawn Forte-Smith and David Gardner, two of her direct reports, for sharing passwords. Kagarise Aff. ¶ 14. Both Kathy Kagarise, Director of Employee Relations at WMC, and Whiteside approved the discipline.[5] Kagarise Tr. 33:7–14. Around August 2017, Forte-Smith and Gardner each approached Kagarise on their own volition. Kagarise Aff. ¶¶ 11–12. Both reported disturbing behavior by David.

On August 25, 2014, Kagarise met with Forte-Smith. On August 27, 2014, Kagarise and Whiteside met with Gardner, who reported the following: David yelled, cursed, and threw a water bottle at him. Kagarise Aff. ¶ 12; Gardner Decl. ¶¶ 5–7. During a July 2013 meeting, Mary told him, "the way you work, why f**k do I need managers?" Gardner Decl. ¶ 5. Later, she would yell at him and tell him "'you better f**king fix' this or that at least once a week." Id. ¶ 6. When Gardner told Mary he 'felt like she was exerting power and control over [him] for no good reason," she responded, "I don't give a s**t." Id. She told him, "You are f**king evidence I don't need any managers." Id. ¶ 7. She asked Gardner while others were around if he was raising his son to have "no common sense like his father." Id. When his son had an incident at home and called Gardner from work, Mary asked if he was "raising a weakling." Id.

Kagarise and Whiteside met with two additional employees that afternoon, and they said similar things about David's behavior. Kagarise Aff. ¶ 12; Affidavit of Dana Morrison ¶ 12; Declaration of Sheryl Crim ¶ 10. Based on those interviews, Whiteside suspended David and directed Kagarise to perform an investigation (the "Investigation") into her behavior. Kagarise Aff. ¶¶ 13–14; Whiteside Aff. ¶ 13.

---

[5] Gardner claims that these write ups inappropriately went far beyond sharing passwords. Gardner Decl. ¶ 8. David does not appear to contest this.

Kagarise interviewed 10 more employees or former employees, for a total of 14 interviewees, who reported directly to or worked closely with David at WMC. Kagarise Aff. ¶ 14 & Ex. 13. The Investigation bore out the following conclusions, among others:

- Director does not support VHS Management decisions and initiatives;
- Director views employees who bring up problems or try to fix problems as being troublemakers;
- Environment is punitive;
- Director has employees on a good list or a bad list; if you are on the bad list you are harassed until you transfer or resign;
- Employees do not feel supported by the director;
- Employees are afraid to bring up problems due to jobs being threatened;
- Employees feel that she runs her departments like a dictator; mentioned Hitler-like; ISIS-like;
- Director screams and yells at employees; throws books and other items when angry;
- Employee stated she was "emotionally raped" by Director;
- Director curses at employees regularly and states "you are not in my circle until I have cursed at you[";
- Director calls Doctor K. "the [f**ker]";
- Uses profanity as an adjective in her everyday speech with employees; and
- Director has marked "do not rehire" on termination forms of employees who were removed due to leave exhaustion; this is illegal.

Id. Ex. 13. David does not appear to dispute that the Investigation reached these conclusions.[6] Kagarise determined that David's behavior was contrary to the requirements of WMC's values, violated multiple WMC policies, and merited immediate termination. Id. ¶¶ 17–18. Whiteside concluded that David's behavior was systemic, given prior PIPs and evaluations. Whiteside Aff. ¶¶ 15–18. Whiteside claimed that David's behavior was the worst she had seen in 30-plus years of experience. In September of 2014, David was terminated. Compl. ¶ 7.

---

[6] Kagarise and Whiteside have attached contemporaneous notes to their affidavits that support their conclusions.

### III.   Motions to Strike

At the threshold, the court must deal with two preliminary matters. David moves to strike WMC's Brief in Support of Its Motion for Summary Judgment. David also moves to strike certain affidavits propounded by WMC. For the reasons described below, the court will **DENY** both motions.

### A.   Summary Judgment Brief

David first moves to strike WMC's Motion for Summary Judgment for failure to comply with Local Civil Rule 56(b). Local Civil Rule 56(b) provides: "Any motion for summary judgment or any other dispositive motion must contain a separately captioned section setting forth with specificity the material facts claimed to be undisputed together with specific record citations in support thereof." W.D. Va. L. Civ. R. 56(b). "The purpose of Local Civil Rule 56(b) is to ensure that a party filing for summary judgment provides notice of the purportedly undisputed material facts, so that both the court and the opposing party can gauge whether summary judgment is appropriate." <u>Dixon Lumber Co. v. Austinville Limestone Co.</u>, 256 F. Supp. 3d 658, 666 (W.D. Va. 2017).

David claims that WMC's Motion for Summary Judgment fails to comply with Local 56(b) because it "does not distinguish between disputed and undisputed facts and presents the Court with a cherry-picked selection of facts that the Defendants contends entitle it to judgment." Mot. Strike 2.

WMC's Motion for Summary Judgment contains a section entitled "Facts." MSJ Br. 2–14. In that section, WMC spends twelve pages setting out the facts it claims are

undisputed. Almost all purportedly undisputed facts contain citations to the record.[7] While WMC did not use the magic words "undisputed" to title this section, Local Civil Rule 56(b) does not require that. And even if the Motion for Summary Judgment contained a smattering of purportedly undisputed facts to which WMC did not include a citation, there "is no indication" that this "was an attempt to mislead the court as to the undisputed facts." Dixon Lumber, 256 F. Supp. 3d at 666–67.

Rather, the court believes that the David filed the Motion to Strike to skirt the court's Scheduling Order, which mandates that "a brief may not exceed twenty-five (25) pages in length . . . unless the filing party first obtains leave of the court." Scheduling Order, ECF No. 29, ¶ 9. If David legitimately believed that WMC had violated Local Civil Rule 56(b), her Motion to Strike could have ended at the fourth page. See Mot. Strike 4 (end of legal argument). Instead, David devotes pages 4 through 18 to a point-by-point refutation of the Motion for Summary Judgment's "Facts" section. See id. 4–18. That factual argument belonged in David's Opposition to the Motion for Summary Judgment, not a motion to strike, which suggests that David used the Motion to Strike as a vehicle to flout the court's Scheduling Order. The parties are advised that any future filings must respect the pages limits set forth in the Scheduling Order.

The court finds that WMC complied with Local Civil Rule 56(b) and will **DENY** the Motion to Strike the Motion for Summary Judgment.

---

[7] The court disagrees with David that "many of the statements presented as 'facts' lack any citation to the record." Mot. Strike 2. The "facts" that lack citation to the record appear to be either inferences that WMC wishes the court to draw from cited facts, see, e.g., MSJ Br. 5 ("David clearly had a deep understanding of the behavior that she was supposed to be modeling."), or are introductory sentences that summarize facts to which WMC then provides citations, see, e.g., id. at 4 ("David did many things well. She struggled, however, with basic interpersonal communications."). The court did not take either type of statement into account when determining which facts are undisputed.

16

## B.  Affidavits

Next, David attacks the submission of the Kagarise, Dallmann, and Whiteside

affidavits. David complains that these affidavits were "all signed on October 31, 2017, two

days before the deadline for" motions for summary judgment, and are therefore "highly

questionable." Mot. Strike 18.

At the threshold, David claims that the affidavits "are inherently questionable because

'[a]ffidavits, though signed under oath by the affiant, are typically and here written by the

affiant's lawyer.'" Mot. Strike 18 (quoting Beckel v. Wal-Mart Assocs., Inc., 301 F.3d 621,

623 (7th Cir. 2002)). David conspicuously fails to quote the entire sentence from Judge

Posner's opinion in Beckel, which sheds light on his statement:

> Affidavits, though signed under oath by the affiant, are typically and here
> written by the affiant's lawyer, and when offered to contradict the affiant's
> deposition are so lacking in credibility as to be entitled to zero weight in
> summary judgment proceedings unless the affiant gives a plausible explanation
> for the discrepancy.

Beckel v. Wal-Mart Assocs., Inc., 201 F.3d 621, 623 (7th Cir. 2002). The failure to include

the whole sentence for context is especially galling given that the Motion to Strike does not

attempt to identify discrepancies between the affidavits and the corresponding deposition

testimony. Alongside the plaintiff "offer[ing] no reason for the discrepancy" between the

deposition and the affidavit, Judge Posner also took umbrage with the affidavit being "filed a

suspiciously long seven months after the deposition." Id. Here, however, David deposed the

affiants on September 29, 2017, and the affidavits were signed on October 31, 2017. In any

event, to the extent that David claims that the court cannot consider the affidavits on

summary judgment because they may have been drafted by a lawyer, the court disagrees.

Perhaps recognizing the mischaracterization of <u>Beckel</u> in her Motion to Strike, David's Reply Memorandum in Support of Motion to Strike ("Motion to Strike Reply" or "Mot. Strike Reply"), ECF No. 47, purports to identify four facts WMC "claims repeatedly as 'undisputed fact,'" <u>id.</u> at 3, that arise from alleged inconsistencies between the affidavits and the remaining record:

> "David did not raise any hint of discrimination in her email to Dallmann."
>
> "David did not raise discrimination in her email."
>
> "In their affidavits, Whiteside and Kagarise deny that David complained of discrimination."
>
> "David did not raise any hint of discrimination in her email to Dallmann."

<u>Id.</u> (internal citations omitted).

The first, second, and fourth "facts" involve interpretation of the October 12, 2012 email about Dr. Restrepo and Haines. To be sure, at her deposition almost five years after the email, David claimed that she meant the statement to convey that "Dr Restrepo . . . treated me like I was a woman within a lesser position and the only thing I was worth doing was taking minutes." David Tr. 170:15–22. But given the absence of any indicia of alleged harassment in the full text of the email and the five-year gap between the email and David's deposition testimony, the court holds that no rational jury could find the October 12, 2012 raised the specter of gender discrimination. <u>See</u> <u>Beckel,</u> 201 F.3d at 623.

While David's argument about the third "fact" holds more weight, it still does not justify striking all three affidavits. At the threshold, David does not contend that the Dallmann affidavit contradicts Dallmann's deposition testimony, mooting any argument that the Dallmann affidavit should be struck on this ground. To the extent that the Whiteside

and Kagarise affidavits may be inconsistent with the respective deposition testimony, the court has already determined that in the light most favorable to David, David raised concerns about harassment with both affiants. Further, even <u>Beckel</u> recognizes that the later-drafted affidavits should only be disregarded "when offered to contradict the affiant's deposition." <u>Id.</u> The court finds no reason to strike the entire affidavits, especially as both affidavits offer substantial corroboration for their assertions in the form of exhibits.

The court finds that the affidavits at issue may properly be considered on summary judgment and will **DENY** the motion to strike the affidavits.

## IV.    Gender Discrimination

Title VII makes it unlawful "to discharge any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). "The ultimate question is whether the employer intentionally discriminated, and that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 146 (2000) (alteration in original) (internal quotation omitted)).

"A plaintiff may proceed either by presenting direct evidence of discrimination, or more commonly, by using the circumstantial evidence and burden-shifting framework first articulated in <u>McDonnell Douglas Corp. v. Green.</u>" <u>Bryant v. Yorktowne Cabinetry, Inc.</u>, 548 F. Supp. 2d 239, 244 (W.D. Va. 2008) (internal citation omitted). Direct proof "includes evidence of conduct or statements that reflect a discriminatory attitude and bear directly on the contested employment decision." <u>Schafer v. Md. Dep't of Health & Mental Hygiene</u>, 359 F. App'x 385, 388 (4th Cir. 2009) (citing <u>Hill v. Lockheed Martin Logistics Mgmt., Inc.</u>, 354

F.3d 277, 284–85 (4th Cir. 2004) (en banc)). The conduct or statements must originate from an "employee [who] possessed such authority as to be viewed as the one principally responsible for the [adverse employment] decision or the actual decisionmaker for the employer." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 291 (4th Cir. 2004) (en banc) (holding that one does not become a decisionmaker "simply because he had a substantial influence on the ultimate decision or because he has played a role, even a significant one, in the adverse employment decision"), abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338 (2013).

In the absence of direct evidence, the McDonnell Douglas framework first requires a plaintiff to demonstrate a prima facie case of gender discrimination. "To establish a prima facie case of gender discrimination, a plaintiff must show: '(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action . . . ; and (4) that similarly-situated employees outside the protected class received more favorable treatment." Gerner v. Cty. of Chesterfield, Va., 674 F.3d 264, 266 (4th Cir. 2012) (alteration in original) (quoting White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004)). When a plaintiff alleges unlawful termination, however, that plaintiff "must demonstrate as the final element that 'the position remained open or was filled by similarly qualified applicants outside the protected class.'" Godbolt v. Trinity Protection Servs., Inc., No. GJH-14-3546, 2017 WL 2579020, at *8 (D. Md. June 12, 2017) (quoting Holland v. Wash. Homes, Inc., 487 F.3d 209, 214 (4th Cir. 2007)).

Once a plaintiff establishes a prima facie case of gender discrimination, "the burden of production then shifts to the employer to articulate a non-discriminatory or non-

retaliatory reason for the adverse action." Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016). If a defendant meets that burden of production, "the McDonnell Douglas framework—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination vel non." Holland v. Wash. Homes, Inc., 487 F.3d 209, 214 (4th Cir. 2007) (alterations in original) (quoting Reeves, 530 U.S. at 142).

While David does not explicitly concede that she cannot proffer direct evidence of discrimination, both David's and WMC's arguments assume the McDonnell Douglas framework applies. The court agrees, as the court finds no direct evidence of discrimination in the record, and will therefore apply the McDonnell Douglas framework.

## A. Similarly Situated Employees

David's discrimination claim fails at the outset as David has failed to demonstrate that a relevant comparator was treated differently than she was.[8] Nor can David successfully avoid this conclusion by converting her claims into sex stereotyping or disparate discipline claims.

### 1. Comparators

The fourth element of a prima facie case does not require a plaintiff "as a matter of law to point to a similarly situated" comparator to succeed on a discrimination claim. Bryant v. Aiken Reg'l Med. Ctrs. Inc., 333 F.3d 536, 545 (4th Cir. 2003). Here, however, David tries to satisfy the fourth element solely on a comparison between David and Dr. Restrepo, a member of a non-protected class. David captions her argument "Defendant treated similarly situated men differently from David." MSJ Opp. 14. The argument under that heading,

---

[8] To the extent that David bases her claim on her termination, the claim must fail, as it is undisputed that David was replaced by another woman. Godbolt, 2017 WL 2579020, at *8; Whiteside Aff. ¶ 19.

21

however, distills down to: "Given Dr. Restrepo's conduct and the fact that he was never disciplined for it, a reasonable jury could find that there was, at best, a double standard for men and women." Id. at 15. Based on David's arguments, the court finds that David has identified Dr. Restrepo as her sole comparator for Title VII purposes.[9]

As David has identified Dr. Restrepo as a putative comparator, she is "required to show that [she is] similar in all relevant respects" to Dr. Restrepo. Haywood v. Locke, 387 F. App'x 355, 359 (4th Cir. 2010) ("[I]n this case, the plaintiffs have based their allegations completely upon a comparison to an employee from a non-protected class, and therefore the validity of their prima facie case depends upon whether that comparator is indeed similarly situated.").[10] While it is true that a comparator need not have the same job title, the comparator must be in a position "similar in the respects that are relevant to the alleged disparate treatment." Bateman v. Am. Airlines, Inc., 614 F. Supp. 2d 660, 674–75 (E.D. Va. 2009). "Such a showing would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" Haywood, 387 F. App'x at 359 (alterations in original) (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)); see also

---

[9] In an answer to an interrogatory, David identifies four other men she claims are comparators. See Pl.'s Answers Def.'s 1st Interrogs., ECF No. 38 Ex. 20, at 30–31. David makes no attempt to explain how these men are otherwise comparable to David, nor does she mention these men in her briefing.

[10] See also Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992) ("It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are all similarly-situated in all respects." (emphasis in original)); Smith v. Stratus Computer, Inc., 40 F.3d 11, 17 (1st Cir. 1994) ("In a disparate treatment case, the plaintiff has the burden of showing that she was treated differently from 'persons situated similarly in all relevant aspects.'" (emphasis in original) (quoting Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989))).

Brown v. Va. Dep't of Transp., No. 7:07CV00282, 2009 WL 424355, at *6 (W.D. Va. Feb. 18, 2009) (same).

David fails to make this showing. The undisputed evidence demonstrates that Dr. Restrepo is not a comparator to David. David reported to the VPN (that is, Tagnesi and Whiteside). Dr. Restrepo does not report to the VPN, as he has a position equivalent to the VPN. Instead, both Dr. Restrepo and the VPN report to the President of WMC. David Tr. Ex. 6. In fact, David admits that Dr. Restrepo and Whiteside are comparators: "Anne Whiteside is Restrepo's peer." MSJ Opp. 5. A comparator must be in the same step in the supervisory chain. See Merriweather v. Shelter House, No. 1-16-cv-00566, 2017 WL 945022, at *3 (E.D. Va. Jan. 27, 2017) (finding no comparator because "[n]ot only were the two women's job titles different, [the comparator's] position in the supervisory chain differed from that of Plaintiff."); accord Strong v. Univ. Healthcare Sys., L.L.C., 482 F.3d 802, 807 (5th Cir. 2007) ("We cannot assume, nor require, that hospitals discipline doctors and nurse coordinators in an identical fashion."). Similarly to Merriweather, Dr. Restrepo is a step up in the supervisory chain. Because David and Dr. Restrepo did not report to the same individual, as a matter of law, Dr. Restrepo cannot serve as a comparator.

Further, Dr. Restrepo is also not an adequate comparator because he did not engage in the same type or degree of conduct as David. Under the summary judgment standard, the court must assume that David's allegations about Dr. Restrepo are true. The court assumes, then, that Dr. Restrepo engaged in behavior that David found demeaning and belittling. On its face, this behavior includes being rude and abrasive to David and treating her differently than other employees.

23

David's actions found in the Investigation, however, extend far beyond what Dr. Restrepo is alleged to have done.[11] The Investigation concluded that David regularly swore and demeaned her direct reports, even going so far as to belittle an employee's child as a weakling. The Investigation found that she blatantly disrespected employees, the only time that Whiteside had ever seen that in her thirty years in healthcare. The Investigation found that she regularly called a doctor "the f**ker." The Investigation found that she illegally marked "do not hire" on termination forms of employees who were terminated due to leave exhaustion. The Investigation found that she sometimes engaged in acts that approached physical violence against her reports. These allegations are far worse than any allegations levied against Dr. Restrepo. Further, David had already been put on a PIP for similar, but less severe, conduct. David does not claim that Dr. Restrepo received similar levels of discipline. Again, for this reason, Dr. Restrepo cannot be a comparator.

Because David has tried and failed to show a comparator was treated differently than she was, her gender discrimination claim must be dismissed.

## 2. Sex Stereotyping Claim

David tries to avoid this conclusion by converting her gender discrimination claim into a sex stereotyping claim. David hangs her hat on Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), superseded by statute on other grounds by 42 U.S.C. § 2000e-2(m), in which a plurality of the Supreme Court noted that "[a]n employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and

---

[11] David makes a blanket denial that she engaged in much of the conduct detailed in the investigation. See MSJ Opp. 13 ("Although she was not given an opportunity to defend herself in the sham investigation, David has denied all allegations made against her by the complaining employees."); David Tr. 231–37. As detailed below, the salient question is whether WMC reasonably believed that the conduct detailed in the investigation actually happened. Accordingly, David's blanket denial is insufficient to raise a genuine issue of material fact as to the reasonableness of WMC's belief.

24

impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not," id. at 251 (plurality opinion).

David's attempt to fit her claim into Hopkins' sex-stereotyping scheme fails on three grounds. First, the Complaint does not include a gender stereotyping claim, and such a claim is not before the court on summary judgment. See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."). The court will not read a gender stereotyping claim into Count I where none otherwise exists.

Second, there is no evidence of gender stereotyping in the record. The court has no reason to doubt that David truly believes that Dr. Restrepo treated David differently because she is a woman. But the record contains no suggestion that Whiteside, the woman who was ultimately responsible for David's termination, "actually relied on [David]'s gender" in deciding to terminate David's employment. Hopkins, 490 U.S. at 251. And while "stereotyped remarks can certainly be evidence that gender played a part" in David's termination, id., the record is bereft of any stereotyped remarks at all, let alone the litany of gender-based remarks that underpinned Hopkins.

Third, it is undisputed that WMC replaced David with another female. It is similarly undisputed that David's replacement "exemplified positive and supportive leadership." Whiteside Aff. ¶ 19. Even if the record contained evidence of gender stereotyping, it is impossible to reconcile David's apparent claim that her position required aggressiveness, see MSJ Opp. 15, with WMC's requirements for David's replacement.

### 3.     Disparate Discipline Claim

David also tries to create a disparate discipline claim. To establish a prima facie case

of disparate discipline, a plaintiff

> must show: (1) that [she] is a member of the class protected by Title VII,
> (2) that the prohibited conduct in which [she] engaged was comparable in
> seriousness to misconduct of employees outside the protected class, and
> (3) that the disciplinary measures enforced against [her] were more severe than
> those enforced against those other employees.

Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993). David's argument again fails.

First, a disparate discipline claim requires a relevant comparator. See Lauture v. Saint

Agnes Hosp., 429 F. App'x 300, 305–06 (4th Cir. 2011) (O'Connor, J.). The court has

already determined that Dr. Restrepo—the only comparator David proffers—is an

inadequate comparator and therefore cannot be used. Second, as the court noted above,

David has failed to identify an employee at WMC who engaged in the same type or degree of

conduct described in the Investigation. With no adequate comparator, David's disparate

discipline claim must fail.

### B.     Satisfactory Job Performance

To satisfy the second element of a prima facie case, a plaintiff must show that she

had "satisfactory job performance" at the time the adverse employment decision occurred.

Prince-Garrison v. Md. Dep't of Health & Mental Hygiene, 317 F. App'x 351, 353 (4th Cir.

2009). This is because "[j]ob performance and relative employee qualifications are widely

recognized as valid, non-discriminatory bases for any adverse employment decision." Evans

v. Tech Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996). Accordingly, where a

plaintiff's job performance was unsatisfactory, a court is "unable to infer discriminatory

intent under the <u>McDonnell Douglas</u> scheme." <u>Karpel v. Inova Health Sys. Servs.</u>, 134 F.3d 1222, 1228 (4th Cir. 1998).

**1.** **Law**

"In evaluating performance, '[it] is the perception of the decision maker which is relevant." <u>Johnson v. Mechanics & Farmers Bank</u>, 309 F. App'x 675, 683 n.8 (4th Cir. 2009) (alteration in original) (quoting <u>Smith v. Flax</u>, 618 F.2d 1062, 1067 (4th Cir. 1980)). A plaintiff's own testimony "cannot establish a genuine issue as to whether" the plaintiff met the defendant's expectations. <u>King v. Rumsfeld</u>, 328 F.3d 145, 149 (4th Cir. 2003); <u>see also</u> <u>Smith v. Flax</u>, 618 F.2d 1062, 1067 (4th Cir. 1980) (A plaintiff's "perception of himself, however, is not relevant.") Instead, a court should review performance and disciplinary records holistically, as it "would defy logic to look at each sort of attendance, disciplinary, or performance problem in a vacuum." <u>Karpel</u>, 134 F.3d at 1228 (internal quotations omitted).

A plaintiff can provide three kinds of evidence showing she was meeting her employer's expectations:

> (1) employer concessions that the employee was performing satisfactorily at the time of the discharge, (2) evidence that the employer had previously given the employee positive performance reviews or (3) qualified expert testimony as to the employer's legitimate job performance expectations and an analysis and evaluation of plaintiff's performance in light of those expectations.

<u>Jones v. Calvert Grp., Ltd.</u>, Civ. No. DKC 06-2892, 2010 WL 5055790, at *6 (D. Md. Dec. 3, 2010) (citing <u>King</u>, 328 F.3d at 149–50), <u>aff'd</u>, 440 F. App'x 220 (4th Cir. 2011). Nonetheless, the timing of the previous comments matters: "[T]he fact that [a] [p]laintiff at one time performed her job well or that Defendant solicited commentary on her work [cannot] refute [a] wealth of evidence presented by [a] [d]efendant to demonstrate her under-

27

performance." Id. at *7. Similarly, prior positive reviews cannot outweigh more recent, negative job performance. Id.; see also Mercer v. Arc of Price Georges Cty., Inc., 532 F. App'x 392, 397 (4th Cir. 2013) ("[T]he fact that [plaintiff] had previously received satisfactory performance reviews does not negate [defendant's] ability to terminate her employment upon the discovery of previously unknown poor performance."); cf. Croy v. Blue Ridge Bread, Inc., No. 3:12-cv-00034, 2013 WL 3776802, at *4 (W.D. Va. July 15, 2013) (finding past write ups could not establish performance-based termination because plaintiff "was never told he was in danger of losing his job" and expectations had to be judged "at the time [plaintiff] was fired").

## 2.    Application

David cannot establish that she was satisfactorily performing to WMC's standards. David bases her argument that she satisfies element two of the prima facie case on her ten years of excellent or outstanding evaluations. David appeals to Jones to contend that these evaluations are sufficient to meet her admittedly "not onerous" burden. Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 511 (4th Cir. 2006). But David ignores that Jones also held that "the fact that Plaintiff at one time performed her job well or that Defendant solicited commentary on her work does not refute the wealth of evidence presented by Defendant to demonstrate her under-performance." Jones, 2010 WL 5055790, at *7.

David would have the court ignore her PIPs and the incident with the security officer. She also ignores that Fourth Circuit's finding that "the fact that [plaintiff] had previously received satisfactory performance reviews did not negate [defendant's] ability to terminate her employment upon the discovery of previously unknown poor performance."

28

Mercer, 532 F. App'x at 397. That matches up well to what happened here: WMC did not know of the depth and extent of David's behavior until August of 2014. It is impossible for WMC to include David's actions toward other employees in evaluations or disciplinarily steps if it did not know she was taking those actions. When WMC found out the extent of David's alleged behavior, both in the nature of the actions and in the number of targets, it took immediate action. Under Mercer and Jones, past performance reviews cannot override WMC's ability to terminate an employee it reasonably believed to be abusing other employees.

David's appeal to Croy is similarly misplaced. WMC is correct that in Croy, the plaintiff offered corroborating evidence for his performance. Croy, 2013 WL 3776802, at *4. Also importantly, however, Croy was never told he was in danger of being terminated. Contrast that with here, where right before the 2011 PIP, WMC strongly considered terminating David, and where David was expressly told that her continued employment with WMC was contingent upon her continued adherence to the company's policies, standards, and values.

Finally, the court is cognizant that it "is the perception of the decision maker which is relevant." Johnson, 309 F. App'x at 683 n.8. David attempts to discredit the Investigation as a sham by making conclusory statements that Whiteside and Kagarise concocted the Investigation to protect Dr. Restrepo and fire David. Like in Supinger v. Commonwealth, No. 6:15-CV-00017, 2017 WL 1498130 (W.D. Va. Apr. 26, 2017), David's claim that WMC investigated her instead of investigating her complaint "is not supported by the facts." Id. at *13. The court has reviewed the record and has found no evidence that Whiteside and

Kagarise investigated David in bad faith or were otherwise fishing for reasons to fire David because of David's complaint against Dr. Restrepo.

Indeed, David does not dispute that Gardner and Forte-Smith approached Whiteside without provocation. The fact that they approached Whiteside temporally proximate to David's threat to file a discrimination claim is of no moment, as the record is bereft of evidence that Whiteside or Kagarise were hunting for a reason to fire David. Further, there is no evidence in the record that Whiteside or Kagarise, the two women responsible for investigating and terminating David, did not believe that the results of the Investigation were accurate. Similarly, David does not appear to argue that the findings of the Investigation would support termination if true.

The findings of the Investigation certainly outweigh any past performance reviews. The findings also violated WMS's values, standards, and policies. Any employer who reasonably believed that the allegations in the Investigation were true would be well within its rights to terminate the employee for poor performance. Given the undisputed facts, no jury could find that David was performing her job satisfactorily at the time she was terminated.

## V. Retaliation

Title VII also makes it unlawful "for an employer to discriminate against any of [its] employees . . . because [she] has opposed any practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 2000e-3. A with gender discrimination cases, a retaliation plaintiff can proceed either by direct evidence, or by showing pretext. See Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 249–50 (4th Cir. 2015).

David provides no direct evidence of retaliation, thereby proceeding on a showing of pretext. See MSJ Opp. 18 (setting forth requirements for a prima facie case of retaliation, which is only applicable when a plaintiff cannot show direct evidence of retaliation). Accordingly, to prevail on her retaliation claim, David "must satisfy the three-step proof scheme established in McDonnell Douglas Corp. v. Green." Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 258 (4th Cir.1998) (internal citation omitted).

First, a plaintiff "must establish, by a preponderance of the evidence, a prima facie case of retaliation." Id.

> To establish a prima facie case of retaliation in contravention of Title VII, a plaintiff must prove "(1) that she was in engaged in a protected activity," as well as "(2) that her employer took an adverse employment action against her," and "(3) that there was a causal link between the two events."

Boyer-Liberto v. Fountainebleau Corp., 786 F.3d 264, 281 (4th Cir. 2015) (en banc) (quoting EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405–06 (4th Cir. 2005)).

"Once established, the burden shifts to the [defendant] to rebut the presumption of retaliation by articulating a non-retaliatory reason for its action." Laughlin, 149 F.3d at 258 (citing Ross v. Commc'ns Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985)). If the defendant meets this burden of production, the presumption "created by the prima facie case is rebutted and 'drops from the case,' and [the plaintiff] bears the ultimate burden of proving that she has been the victim of retaliation." Id. (internal citations omitted). At this third step, a plaintiff must show that the stated reason for her termination was pretext. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804 (1973).

## A.    Element One: Engaged in a Protected Activity

With respect to element one, David claims she was fired "in retaliation for her complaint about gender discrimination." MSJ Opp. 18. In other words, David claims she was fired while engaged in protected oppositional activity. David fails to satisfy the legal or factual requirements of this element, requiring dismissal of her retaliation claim.

### 1.    Law

"Oppositional activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." Laughlin, 149 F.3d at 259; see also Prince-Garrison, 317 F. App'x at 354 ("Protected activity within the meaning of Title VII includes opposing discriminatory practices or participating in any manner in a Title VII investigation, proceeding, or hearing."). Notably, in a retaliation claim based on oppositional activities, "an employee must be complaining of an unlawful employment practice or actions the employee reasonably believes are unlawful." Prince-Garrison, 317 F. App'x at 354.

A plaintiff's belief of an unlawful employment practice is gauged by an objective standard: Would a reasonable person believe that the incidents at issue violated Title VII? See Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 271 (2001) (per curiam); see also Boyer-Liberto, 786 F.3d at 282 ("In the context of element one of a retaliation claim, an employee is protected when she opposes 'not only . . . employment actions actually unlawful under Title VII but also employment actions [she] reasonably believes to be unlawful." (alterations in original) (quoting Navy Fed., 424 F.3d at 406)). "A plaintiff 'may prove sex-based discrimination in the workplace even though she is not subject to sexual advances or

32

propositions,' but she can succeed only by showing that she 'is the individual target of open

hostility because of her sex.'" <u>Ziskie v. Mineta</u>, 547 F.3d 220, 226 (4th Cir. 2008) (quoting

<u>Ocheltree v. Scollon Prods., Inc.</u>, 335 F.3d 325, 331 (4th Cir. 2003) (en banc)).

Finally,

> [i]n determining whether an employee has engaged in a legitimate opposition
> activity, the Fourth Circuit has held that courts should "balance the purpose
> of the Act to protect persons engaging reasonably in activities opposing . . .
> discrimination against Congress' equally manifest desire not to tie the hands of
> the employers in the objective selection and control of personnel."

<u>Simard v. Unify, Inc.</u>, 1:15cv1649 (JCC/TCB), 2016 WL 3854451, at *6 (E.D. Va. July 15,

2016) (alteration in original) (quoting <u>Johnson</u>, 309 F. App'x at 685). To that end, "self-

serving affidavit[s]" are not enough to defeat a motion for summary judgment. <u>Nat'l Enters.,</u>

<u>Inc. v. Barnes</u>, 201 F.3d 331, 335 (4th Cir. 2000); <u>see also</u> <u>Simard</u>, 2016 WL 3854451, at *6.

### 2.    Application

David argues that she objectively believed she was subject to sexual harassment from

Dr. Restrepo based on the following facts from the record:

> David complained to Whiteside "that I felt Dr. Restrepo's behavior towards
> me was demeaning and humiliating, that **he was discriminating against me
> based on my being a female and being lesser than him**, that he
> constantly—that he constantly called me out in front of everybody, even if I
> wasn't there." (David Tr. 206:2–7) (emphasis added). David also testified that,
> two days before her suspension, "I had told [Whiteside] that I'd had enough
> and I was going to make a formal complaint since none of what I had done
> was making a difference." (David Tr. 220:22–24) David testified: "I had the
> conversation with [Whiteside] on [August] 25th. Two days later on the 27th, I
> was called to the office and told I had a problem and sent home." (David Tr.
> 222:6–9).

MSJ Opp. 19 (last alteration in original). David claims that "Boyer-Liberto makes clear that such statements as those made by David must be protected from retaliation in order to encourage early reporting vital to achieving Title VII's goal of avoiding harm." Id.

David misconstrues the import of Boyer-Liberto. While it is true that "an employee is protected from retaliation when she opposes a hostile work environment that, although not fully formed, is in progress," Boyer-Liberto confines Title VII protection to an employee who opposes "employment actions actually unlawful under Title VII [or] employment actions [she] reasonably believes to be unlawful.'" 786 F.3d at 282 (quoting Navy Fed., 424 F.3d at 406). Because David was complaining about Dr. Restrepo's actions, David's statements may be protected from retaliation only if Dr. Restrepo's actions were either actually unlawful under Title VII or David could reasonably believe they were unlawful under Title VII.

The court does not doubt that David actually believed that Dr. Restrepo was discriminating against her based on her gender. But the dispositive question is whether David could reasonably believe that Dr. Restrepo subjected her to open hostility because of her gender. See Ziskie, 547 F.3d at 226. Notably, in her Opposition to the Motion for Summary Judgment, David makes no attempt to paint Dr. Restrepo's actions as severe enough that David could reasonably believe that they were unlawful. Nonetheless, the court has examined the record in the light most favorable to David to answer that question.

The problem for David is that the record is devoid of any suggestion that Dr. Restrepo treated her any differently because she was female. The allegedly discriminatory actions—Dr. Restrepo calling out David by name when she tried to enter the August 21,

2014 meeting, making David sit near him and take notes during meetings, and calling out David in front of others when she was absent from meetings—may be unfortunate, but they are "a far cry from the obviously sex-related conduct in Jennings, where a male soccer coach incessantly talked about his female players' sex lives and bodies, or in Ocheltree, where male employees repeatedly demonstrated sexual practices on a mannequin in front of the plaintiff." Id. (internal citations omitted); see also Nathan v. Takeda Pharm. Am., Inc., 890 F. Supp. 2d 629, 641 (E.D. Va. 2012) (same).

The court finds that no reasonable person would believe that Dr. Restrepo's admittedly rude behavior could constitute a Title VII violation. This is borne out by the record. David admitted in deposition that when she entered the August 21, 2014 meeting, Dr. Restrepo called her out by name, but did not call out the two other females who entered at the same time. David Tr. 103:1–4. While David claimed that Dr. Restrepo treated all women differently than men, she admitted that two of the three vice presidents who participated in safety calls were female, id. 210:13–20, yet could not point to any examples of Dr. Restrepo treating the female vice presidents differently than any males. Similarly, all seven directors who served under the VPN were female, but the record contains no evidence that Dr. Restrepo treated the six other female directors differently than males. In fact, in the only purported example of Dr. Restrepo treating females as a group differently than males, David testified: "I think he spoke in derogatory terms to other women, didn't address them as—as my friend or my colleague. We were all like, You do this or you go do that. I think he was very disrespectful." Id. 113:25–114:3. While that language might be

disrespectful, it is not actionable, "for Title VII is not 'a general civility code.'" Ziske, 547 F.3d at 228 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)).

The court has no doubt that Dr. Restrepo treated David more harshly than she would have liked, and the court has no doubt that David believed this treatment was because she was a woman. But the court cannot find that a reasonable person would believe that Dr. Restrepo's actions constituted a violation of Title VII. "Simply not getting along with others and 'personality conflicts' are not enough" to establish animus based on sex, Nathan, 890 F. Supp. 2d at 641, and there is nothing in the record to suggest that Dr. Restrepo's treatment of David was anything more than his inability to get along with others. Because a reasonable person would not believe that Dr. Restrepo's actions rose to the level of a Title VII violation, David's retaliation claim fails.

## B.     Element Three: Causal Link

The parties argue past each other over whether David has established the third element of a prima facie case of retaliation: "that there was a causal link between the two events." Boyer-Liberto, 786 F.3d at 281. WMC seems to argue that David fails to establish element three because she has not established but-for causation: that WMC would not have fired David had she not raised Dr. Restrepo's alleged discrimination. See MSJ Br. 20.

David gives the third element short shrift, claiming that "[c]ourts can infer causation when the adverse action occurs shortly after a plaintiff engaged in a protected activity," then moving to the final stage of the McDonnell Douglas framework. MSJ Opp. 19. David claims that case law counsels that temporal proximity is sufficient to show but-for causation. Id. 20.

Much of the dispute concerns the differing causation standards a court must apply at the prima facie stage versus the final, pretext stage. To that end, the Fourth Circuit has held that "the causation standards for establishing a prima facie retaliation case and proving pretext are not identical. Rather, the burden for establishing causation at the prima facie stage is 'less onerous.'" Foster, 787 F.3d at 251 (quoting Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989)).

At the pretext stage (that is, the final stage of the McDonnell Douglas framework), the Supreme Court recently held that retaliation claims "must be proved according to traditional principles of but-for causation," which requires a plaintiff to prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Univ. of Tex. S.W. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013).

The Fourth Circuit has, however, rejected the argument that Nasssar changed the "less onerous" causation requirement at the prima facie stage. See Foster, 787 F.3d at 251 ("We therefore hold that Nassar does not alter the causation prong of a prima facie case of retaliation."). All a plaintiff has to show is that the record "suggests" or "tends to show causation." Id. at 253 (emphasis omitted).

Because the court has already determined that David did not engage in protected activity, it necessarily follows that there cannot be a causal link between David's alleged protected activity and her termination. But the court will assume, for the moment, that David has established that she engaged in protected activity. Because David need not prove

but-for causation to satisfy element three of a prima facie case, WMC's argument that temporal proximity is insufficient to demonstrate but-for causation is moot.

Instead, David is correct that temporal proximity can be sufficient to establish the causation requirement of element three of a prima facie case. See, e.g., Waag v. Sotera Defense Solutions, Inc., 857 F.3d 179, 192 (4th Cir. 2007) ("We agree that, for purposes of establishing a prima facie case, close temporal proximity between activity protected by the statute and an adverse employment action may suffice to demonstrate causation."); Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989) (holding that termination shortly after protected activity satisfied causal connection element at prima facie stage); accord Young v. City of Phila. Police Dep't, 651 F. App'x 90, 98 (3d Cir. 2016) (adverse employment action that follows an EEO complaint by only eight days is suggestive of retaliation at the prima facie stage); Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (termination two days after corporation received EEOC charge established a prima facie case). Accordingly, if David had engaged in a protected activity, the court finds she would have established element three of a prima facie case of retaliation.

## C.    Pretext and Causation

The causation story changes, however, at the final stage of the McDonnell Douglas framework. At this stage, retaliation claims "must be proved according to traditional principles of but-for causation," which require a plaintiff to prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions

38

of the employer."[12] Nassar, 133 S. Ct. at 2533. While WMC may have mistakenly framed

causation vis-à-vis David's prima facie case, this is the real crux of WMC's argument: WMC

contends that David has not shown that her threatened complaint against Dr. Restrepo was

the but-for cause of her termination. Even assuming that David engaged in protected

activities, a conclusion this court has already rejected, she fails to establish that the outcome

of the Investigation was merely a pretext that allowed WMC to fire her because of her

protected activities.

### 1.    Law

At the final stage of the McDonnell Douglas framework, "a plaintiff must show the

legitimate non-retaliatory justification is merely pretext for retaliation." Ramos v. Molina

Healthcare, Inc., 963 F. Supp. 2d 511, 529 (E.D. Va. 2013) (citing Tex. Dep't of Cmty

Affairs v. Burdine, 450 U.S. 248, 253 (1981)). Again, a plaintiff must accomplish this by

demonstrating "but for" causation: The unlawful retaliation would not have occurred if the

plaintiff had not engaged in the protected activity. See Nassar, 133 S. Ct. at 2533. A

"[p]laintiff must establish first that these legitimate reasons are not truthful and second that

the real reason for the adverse action was [the] [p]laintiff's engagement in the protected

activity." Ramos, 963 F. Supp. 2d at 529; see also Beall v. Abbot Labs., 130 F.3d 614, 619

(4th Cir. 1997) (A plaintiff satisfies this showing only by "'proving both that the reason was

false, and that the discrimination was the real reason for the challenged conduct." (emphasis

---

[12] In the second stage of the McDonnell Douglas framework, WMC must "articulat[e] a non-retaliatory reason for" David's termination. Laughlin, 149 F.3d at 258. WMC's burden is only of production, however. See Guessous, 828 F.3d at 216. As with David's gender discrimination claims, the Investigation provides a non-retaliatory reason for David's termination, and WMC has met its burden of production.

and internal quotations omitted)), abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).

When gauging whether the proffered reason for the adverse action was truthful, "[j]ob performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision." Evans, 80 F.3d at 960. Further, "Title VII is not a vehicle for substituting the judgment of a court for that of the employer." Jiminez v. Mary Washington Coll., 57 F.3d 369, 377 (4th Cir. 1995). Accordingly, "[i]t is the perception of the decision maker which is relevant." Evans, 80 F.3d at 960–61 (quoting Smith, 618 F.2d at 1067). "Thus, when an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." Giannopoulous v. Brack & Brock Confections, Inc., 109 F.3d 406, 411 (7th Cir. 1997); see also DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998) (adopting Giannopoulous).

Under this framework, it is clear that an employer is not prohibited from effecting an adverse employment action against an employee simply because that employee has engaged in activity protected by Title VII. Moreover, "it makes no difference if the employee was in fact guilty of misconduct; as long as the employer discharged the employee because it honestly believed that the employee had engaged in misconduct," a court will not second guess upon the employer's decision. Pence v. Tenneco Auto. Operating Co., 169 F. App'x 808, 811 (4th Cir. 2006). "This is especially true for hospitals providing serious medical care to patients." Strong, 482 F.3d at 808; see also Breeden, 532 U.S. at 272.

40

Finally, while temporal proximity may be sufficient to satisfy the causation requirement for a prima facie case, "temporal proximity alone is not sufficient to establish that . . . engagement in protected activity was a 'but for' cause of" an adverse employment action. Staley v. Gruenberg, 575 F. App'x 153, 156 (4th Cir. 2014); see also Hernandez v. Yellow Transp., Inc., 670 F.3d 644, 660 (5th Cir. 2012) ("'But for' causation, however, cannot be established by temporal proximity alone.").

## 2. Application

The record fails to establish that (1) David's protected activities (to the extent she was engaged in any) were the real reason for her termination, or (2) the proffered reason for her termination—the outcome of the Investigation—was not truthful. The court examines both in turn.

At least with respect to David's requirement to show but-for causation at the pretext stage, WMC is correct that "David . . . relies solely on the temporal proximity between her complaint and her termination to support her retaliation claim." Def.'s Reply Br. Supp. Mot. Summ. J., ECF No. 43, at 21. David attempts to reject the conclusion that "temporal proximity is insufficient to show but-for causation" by noting that "[t]he Fourth Circuit had held that proximity in time can be sufficient to establish the necessary causal connection between an employee's protected activity and the adverse employment action." MSJ Opp. 20.

David is only half right, and that is fatal to her claim. The court has reviewed the cases that David cites and their progeny, and agrees that temporal proximity is sufficient to establish causation for David's prima facie case. But at the pretext stage, David has to

41

demonstrate but-for causation. In Staley, the Fourth Circuit rejected the very argument on which David's retaliation claim relies. See 575 F. App'x at 156. While Staley was unpublished, the Fifth Circuit has reached the same conclusion in a published opinion. See Hernandez, 670 F.3d at 660.

The court finds Staley and Hernandez persuasive, and for good reason: But-for causation is a stringent standard mandated by the Supreme Court, and allowing a plaintiff to establish causation on temporal proximity alone would contravene Congress' "manifest desire not to tie the hands of the employers in the objective selection and control of personnel." Simard, 2016 WL 3854451, at *6. The record contains no other suggestion that David's termination was motivated by her threat to file a harassment complaint against Dr. Restrepo. As David has failed to "demonstrat[e] a nexus between the protected activity and" her termination, Ramos, 963 F. Supp. 2d at 530, David has failed to show pretext.

Similarly, David has not proven that the Investigation was not the truthful reason for her termination. As the court discussed above, the record demonstrates that Whiteside and Kagarise, the decisionmakers at WMC responsible for terminating David, reasonably believed in the conclusions of the Investigation, and David's contentions to the contrary do not create a genuine issue of material fact. The record betrays no indication that Whiteside and Kagarise used the Investigation as a pretext to terminate David for her threatened harassment complaint about Dr. Restrepo. Accordingly, David has failed to show pretext.

## VI.  Conclusion

The record cannot support David's claims of gender discrimination and retaliation.

Accordingly, WMC's Motion for Summary Judgment, ECF No. 37, is **GRANTED**, and

David's Motion to Strike, ECF No. 40, is **DENIED**.

Entered: 01 – 05 – 2018

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge